# In the United States Court of Federal Claims

PLATEAU SOFTWARE, INC.,

    *Plaintiff,*

v.

THE UNITED STATES OF AMERICA,

    *Defendant,*

and

CONCURRENT TECHNOLOGIES CORPORATION,

    *Intervenor.*

No. 22-745
(Filed: October 18, 2022)
(Re-issued: November 8, 2022)*

*Matthew Schoonover*, Olathe, KS, for Plaintiff. *Matthew P. Moriarty*, *John M. Mattox*, and *Ian P. Patterson*, of counsel.

*Sonia Williams Murphy*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

*Seamus Curley*, Washington, DC, for Intervenor, with whom was *Chelsea Goulet*.

**OPINION AND ORDER**

**LERNER,** *Judge*.

    Plaintiff, Plateau Software, Inc. ("Plateau") filed this pre-award bid protest challenging a Task Order Request for Proposals ("RFP," "Solicitation," or "Task Order") that the General Services Administration ("GSA") issued under the One Acquisition Solutions for Integrated Services ("OASIS") Contract. Compl., ECF No. 1; Admin. R. ("AR") at 449, ECF No. 18 (February 4 Solicitation). "OASIS is a family of [seven] separate Government-wide Multiple Award, Indefinite Delivery, Indefinite Quantity (MA-IDIQ) task order contracts" for professional, scientific, and technical services. AR 10 (OASIS Contract). Plateau holds an

---

* The Court initially filed this opinion under seal to allow the parties to propose redactions. The Court has incorporated the proposed redactions in this public version of the opinion. Words or phrases that are redacted have been replaced with [ * * * ].

OASIS Small Business Contract and protests the Solicitation on the ground that it exceeds the scope of the OASIS IDIQ Contract.

Plateau alleges that the Task Order's predominant scope of work is information technology ("IT") services, which is prohibited under OASIS. Compl. Therefore, Plateau moves for two forms of equitable relief. First, it requests that the Court issue a declaratory judgment stating that the work under the Task Order exceeds the scope of OASIS and violates the Competition in Contracting Act, 41 U.S.C. § 253 ("CICA").[1] It also requests an injunction requiring the agency to bifurcate the IT and non-IT work and reissue two separate procurements. Pl.'s Mot. for J. on the Admin. R. ("Pl.'s Mot.") at 15, 31–32, ECF No. 33.

Before the Court are cross-motions for judgment on the administrative record from the Plaintiff, the Government, and Intervenor, Concurrent Technologies Corporation ("CTC"). After review of the administrative record, the Court finds that the Task Order does not appear to seek predominantly IT services, and the ordering contracting officer's ("OCO") decision to issue the Task Order under OASIS was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Thus, for the reasons set forth below, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**, and the Government and CTC's Motions for Judgment on the Administrative Record are **GRANTED**.

## I.     Factual Findings

### A.     The OASIS Contract

The OASIS Contract is a professional staffing government-wide acquisition contract ("GWAC") consisting of seven MA-IDIQs called "pools." *See, e.g.*, AR 10 (OASIS Contract). The stated objective of OASIS Pool 1, at issue here, is "to provide Government agencies with total integrated solutions for a multitude of professional service-based requirements on a global basis." AR 16 (OASIS Contract § C.1). OASIS aims to provide "maximum flexibility" and notes that "[t]hese professional service requirements may call for solutions that cross over multiple disciplines." *Id.* OASIS describes its overall scope as follows:

> The scope of OASIS spans many areas of expertise and includes any and all components required to formulate a total solution to a professional services-based requirement, except for those services specifically prohibited in Section C.5. These areas of expertise include but are not limited to the following categories:
>
> 1. Communication
> 2. Compliance
> 3. Defense
> 4. Disaster

---

[1] A task order that "drastically increases the scope, as delineated in the underlying IDIQ contract's statement of work . . . is essentially a new procurement which was never subjected to full and open competition—in contravention of CICA." *DynCorp Int'l LLC v. United States*, 152 Fed. Cl. 490, 502–03 (2021).

      5. Energy
      6. Environment
      7. Financial
      8. Health
      9. Intelligence
     10. Security
     11. Transportation

*Id.* OASIS defines "professional services" as "those categories of services provided under one or more of the following Core Disciplines:" program management, management consulting, scientific, engineering, logistics, or financial management services. AR 18–22 (OASIS Contract § C.2.2).

To provide integrated solutions with "maximum flexibility," OASIS authorizes limited procurement of services and products, which would otherwise fall outside its professional services scope, through what it calls "ancillary out-of-scope support services." AR 23, 77. "'Ancillary Out-of-Scope' support services are defined as services not within the scope of OASIS that are integral and necessary to complete a total integrated solution under a professional service-based requirement within the scope of OASIS." AR 23. Under OASIS, "IT is considered an ancillary support service or product on OASIS task orders," and it may only be performed when it is "integral and necessary to complete a total integrated solution under a professional service-based requirement within the scope of OASIS." AR 22.

OASIS defines IT as follows:

> Information Technology (IT), by legal definition, means any equipment, or interconnected system(s) or subsystem(s) of equipment that is used for the automatic acquisition, storage, analysis, evaluation, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information by the agency. For purposes of this definition, equipment is used by an agency if the equipment is used by the agency directly or is used by a Contractor under a contract with the agency that require its use, or to a significant extent, its use in the performance of a service or the furnishing of a product.

AR 22. OASIS excludes certain incidental IT services and equipment from its definition of IT. It classifies such services as "non-IT," which:

> includes any service or equipment that is acquired by a Contractor incidental to a contract or contains imbedded IT that is used as an integral part of the service or product, but the principal function of which is not the acquisition, storage, analysis, evaluation, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information. (For example, HVAC (heating, ventilation, and air conditioning) equipment, such as thermostats or temperature control devices, and medical equipment where IT is integral to its operation, is <u>non-IT</u>).

> Non-IT also includes any equipment or services related to a National Security System. The term "National Security System" means a telecommunications or information system operated by the Federal Government, the function, operation, or use of which involves intelligence activities, cryptologic activities related to national security, command and control of military forces, equipment that is an integral part of a weapon or weapons system; or, is critical to the direct fulfillment of military or intelligence missions, not including a system to be used for routine administrative and business applications (including payroll, finance, logistics, and personnel management applications).
>
> Non-IT may include imbedded IT components including software, IT hardware, and other items and services traditionally considered IT on IT requirements.

AR 22–23 (OASIS Contract § C.3) (emphasis removed). While these exempted services might be considered IT for other purposes, OASIS explicitly treats them as non-IT. *See id.* Importantly, such "[n]on-IT professional services are not considered ancillary support services. Non-IT professional services are considered to be within the primary scope of OASIS." *Id.* (emphasis removed).

When a task order is issued, it is assigned a North American Industry Classification System ("NAICS") code that "reflect[s] the principal nature of the work required under the task order." AR 86 (emphasis removed). OASIS calls this the "principal purpose NAICS code." *E.g.*, AR 76. The principal purpose NAICS code assigned to a task order determines which OASIS Pool is appropriate for issuing the task order and what size businesses may compete for it. AR 86.

The OASIS Ordering Guide, which is a guidance document separate from the OASIS IDIQ Contract, instructs the OCO to use a task order's assigned NAICS code to determine whether a task order is within OASIS's scope. The OCO cross-references the task order's NAICS code with the approved NAICS codes for the relevant Pool listed in OASIS Ordering Guide Appendix A. AR 86. A task order is within the scope of a particular Pool if its NAICS code matches one of the Pool's NAICS codes. *Id.* "If the principal purpose of the requirement is for any other NAICS code outside the OASIS NAICS codes, it is out of scope for OASIS." AR 86. Under the OASIS Ordering Guide, the OCO has sole authority to assign the task order's principal purpose NAICS code and then determine whether it matches an Appendix A NAICS code. *Id.*

In addition to providing an overview of services within OASIS's scope, OASIS expressly identifies "services not in scope." AR 23. It states that "the OCO shall not issue a task order and a Contractor shall not accept or perform work for the following services when the *predominant* task order scope of work[] is . . . [a]n 'Ancillary-Out-of-Scope' support service," such as IT. AR 23, OASIS Contract § C5 (emphasis added). OASIS clarifies that "'scope of work' does not directly correlate to labor mix/breakdown. Scope of work instead refers to the principle [sic] purpose or objective of the work required under the task order." AR 23. In addition, the OASIS Ordering Guide states that "OASIS task orders shall NOT include . . . [r]equirements where the principal purpose is to obtain IT products and/or services or any ancillary service." AR 76

4

(OASIS Ordering Guide).  The OASIS Ordering Guide grants the OCO alone the authority to determine the principal purpose of a task order:

> All OASIS task orders must be within scope of OASIS. . . . Provided the OCO determines the principal purpose NAICS code for the order to be one of the OASIS NAICS Codes (see Appendix A), it is within scope of OASIS. If the OCO determines it is a NAICS code outside one of the OASIS NAICS codes, it is not within scope of OASIS.  It is that simple.

AR 76 (OASIS Ordering Guide).

### B.     The Task Order Solicitation

On February 4, 2022, GSA issued the Task Order Solicitation (No. RFQ1531673) under OASIS Pool 1.  Compl. ¶ 16; AR 446 (February 4 Solicitation).  It sought a contractor to provide staffing support on safety assessment and mitigation initiatives for the Department of Defense's ("DoD") Force Safety and Occupational Health ("FSOH") office.  AR 450.  The Solicitation was amended three times in March 2022.  AR 786, 937, 1029.  The Task Order's Performance Work Statement ("PWS") explains that GSA seeks a contractor to "provide all personnel, equipment, supplies, facilities, transportation, tools, materials, supervision, other items and non-personal services necessary to perform occupational health, management, data analytical and information technology services."  AR 873.  Specifically, the technical scope of the Task Order "requires a technically proficient contractor with the inherent staffing, subject matter expertise, and reach-back capabilities to support FSOH programs in the development, implementation, and provision of policies, guidance, oversight, and strategic communications to meet safety and occupational health mission objectives across the [DoD]."  AR 877.

The FSOH office "is responsible for advising the [DoD] on key military and civilian safety concerns with the objective of ensuring ready and responsive military forces."  AR 874.  It supports the Safety and Occupational Health ("SOH") Working Groups and Task Forces of the Defense Safety Oversight Council, a DoD safety governance body that "promotes data informed decisions that mitigate operational safety and occupational safety and health risks within the DoD."  *Id.*  The Task Order awardee would be "responsible for supporting FSOH in all its SOH and mishap reduction efforts, which are targeted at tracking, analyzing, mitigating, and reducing preventable mishaps while accruing readiness benefits within DoD."  *Id.*

The OCO assigned the Task Order Solicitation NAICS Code 541330, Engineering Services.  AR 450.  The PWS states that the Task Order is generally designed "to provide Analytic and Technical support for OUSD [Office of the Undersecretary of Defense] Readiness Safety Systems."  AR 873.  Specifically, the PWS describes the objectives of the Task Order as follows:

> The contractor will provide professional services to support the FSOH in meeting policy objectives.  The objective of the contract is to support an integrated, comprehensive SOH program designed to reduce mishap, injury and occupational illness risk, and enable an enduring safety culture across the Department.  The

5

> Contractor shall provide both on and offsite technical, analytic, safety, engineering, and other expertise required to support the Department's enterprise safety risk management objectives.
>
> The contractor will assist maintain [sic] DoD databases in support of the FSOH policy objectives. The contractor will provide a combination of professional services and ancillary IT services and supplies to support the gathering, analysis, and dissemination of data related to the occupational safety goals of the FSOH.

AR 876–77.

The original Solicitation estimated the breakdown of work under the contract to be 68% non-IT services (32% data analytics and overall program support, and 36% safety management system support), and 32% IT related, ancillary OASIS support. AR 456–57. However, Amendment 3 to the Solicitation estimated the breakdown differently, added detail to the work descriptions, and mapped the percentage estimates to the relevant PWS sections. AR 1037. It valued IT work at 39% and non-IT at 61%:

> PWS 5.0-5.4. 39% IT related, Ancillary OASIS Support. These services are necessary to provide an integrated solution for the Department of Defense's Safety Program. (Systems / Process Engineering Support)
>
> 61% Professional Services – Non IT
>
>> PWS 3.1-3.10. 37% Data analytics and overall program support (Systems / Process Engineering Support), [i]ncludes non-IT related data analytics such as raw safety data provided to [subject matter experts] such as health and safety engineers, biochemists and aerospace engineers, epidemiologists, etc., for analysis.
>>
>> PWS 4.1-4.4. 24% Safety Management System Support (Systems / Process Engineering Support).

*Id*. (cleaned up). Although GSA provided estimates of IT and non-IT allocations, the Solicitation nevertheless encouraged contractors to propose "their own unique solution" to the breakdown of labor. *Id.*

Sections 3 through 5 of the PWS describe in detail the specific tasks and deliverables under the Task Order. AR 891–909. PWS Section 3 largely describes "non-IT" professional services in the form of subject matter experts ("SMEs") and personnel to assist with the following tasks:

- Supporting day-to-day FSOH office operations (PWS § 3.3);

6

- Administering DoD SOH issuances and directives, including technical analysis of DoD safety risks, risk management options, and DoD policies (PWS § 3.4);

- Coordinating safety governance forums and meetings (PWS § 3.5);

- Supporting safety and mishap data standardization, modernization, and integration efforts, which requires developing and ensuring conformance with an SOH data strategy (PWS § 3.6);

- Data analysis and reporting to "identify information that can be used to reduce mishaps and mitigate risks" and "[a]nalyze and interpret . . . mishap [data], military injury treatment case data and civilian injury data . . . as it applies to both the operational and occupational safety and health environments" (PWS § 3.7);

- Supporting DoD's Advana application with "individuals with expertise specific to processing, aggregating, and reporting safety and safety related data, in particular understanding DoD Component mishap data requirements and conforming safety and integrating safety data sets, to support ongoing evolution of the DoD Advana tool" (PWS § 3.8);

- "[I]ntegrating safety technologies and solutions into the DoD acquisition process" and liaising with relevant DoD communities (PWS § 3.9); and

- Supporting the Office of Drug Demand Reduction in various ways (PWS § 3.10).

AR 892–97.

PWS Section 4 seeks "non-IT" professional services in the form of SMEs and technical support personnel "to provide an integrated framework and comprehensive approach to DoD SOHMS [Safety and Occupational Health Management Systems], resulting in improved safety program performance at DoD sites and installations by controlling safety risks in operations." AR 898.

PWS Section 5 covers the Task Order's ancillary out-of-scope IT requirements. Under this section, contractor personnel must provide operations and maintenance support for several DoD and FSOH electronic tools, as well as provide end user and remote support and trainings. AR 901–02. This includes the operation, maintenance, and modernization of the Force Risk Reduction ("FR2") data warehousing tool. *Id.* (PWS §§ 5.2–5.4). "FR2 is a personnel-focused, data-driven, web-based SharePoint site that provides OSD [Office of Secretary of Defense], Service Agency, and other key DoD users a central location to review, evaluate, and monitor DoD safety data, such as non-hostile fatalities, injuries, suicides, and, in the future, positive drug-test results." AR 639 (Software User's Manual for Force Risk Reduction (FR2)). The Solicitation contemplates an "increase in the [level of effort] as compared to the previous

contract in Section 5.4, FR2 Modernization beginning in Option Period 01." AR 1037 (Solicitation Amendment 3).

### C.     Market Research and Scope Reviews

In the early stages of the acquisition process, GSA gathered market research to determine the best acquisition strategy for the services needed. It issued two Requests for Information ("RFIs") soliciting industry feedback and obtained a Defense Contract Management Agency ("DCMA") report based on DCMA's market research. AR 347–350 (DCMA commerciality report); AR 351–361 (first RFI); AR 362–372 (second RFI); AR 373–413 (second RFI report). It also conducted its own review of acquisition history documents, the DCMA report, and the RFI results. *See* AR 420–440 (Task Order market research report). The RFIs asked industry participants, which included potential offerors in this task order competition, to share capability statements regarding the work and provide recommendations for the contracting approach and NAICS code. AR 1198. The Second RFI Report reflected that industry participants overwhelmingly recommended OASIS Pool 1. AR 362, 373–75; *see also* AR 351–53, 361.

Following a "review of previous market research for this requirement[,] . . . the U.S. Census Bureau's website[,] . . . and the 2017 NAICS definition," the OCO selected the Engineering Services NAICS code for the Task Order. AR 373–75, 420. The OCO's December 9, 2021 market research report concluded that "[e]ngineering services constitute the principal purpose for the work provided under this requirement and particularly systems engineering and data analytics." AR 420.

GSA also conducted several scope reviews to determine which GWAC best suited the agency's requirements. AR 1196–1200. In December 2019, scope reviews for other contract instruments—IT Schedule 70, 8(a) Stars II, VETS 2, and Alliant 2—concluded that the work would be out of scope for each of these IT-based vehicles. AR 105–107. The Task Order's scope of work that was submitted for the IT Schedule 70 scope review described the work as "data collection and reporting of actionable data that is used to support decision and risk analysis, management, and resource allocation, identification, and implementation of targeted mitigations to reduce risks inherent in daily operations, and reduction of unexpected and unintentional negative consequences that erode readiness/operational capacity." *Id.* This scope review found that the Task Order was incompatible because its scope of work was "too broad." AR 105.

Similarly, the scope reviews for the 8(a) Stars II and VETS 2 GWACs concluded that "[w]hile there is a significant amount of IT services within this task, the On-Site Visit Support in 3.3.4 is not IT services nor is it within the allowances provided in the contracts for ancillary support." AR 106. The Alliant 2 scope review did not explain why the work was not within its scope. AR 107. However, the OASIS scope review, which appears to have occurred in two parts, twice concluded that the Task Order was within OASIS's scope. *See* AR 113, 108. The first scope review submission and in-scope determination were on November 22 and 23, 2019, respectively. AR 113. Additional submissions and a final in-scope determination on February 2, 2022, followed. AR 108. According to the record, GSA revised the requirements in the PWS at some point following the IT GWAC scope reviews and before the February 2022

8

OASIS scope review. *Compare* AR 1245 – 1269 (October 28, 2019 PWS, submitted for IT GWAC scope reviews) *with* AR 1300 (January 13, 2022 PWS, submitted for February 2022 OASIS scope review).

### D. GAO Protest

On March 7, 2022, the day before proposals were due, Plateau filed a protest with the Government Accountability Office ("GAO"). AR 449, 1134. Plateau claimed that GSA's "procurement strategy [was] flawed for three reasons": (1) GSA's decision to "procur[e] significant, primarily IT-related services through OASIS . . . violate[d] the express terms of the OASIS contract and [was] unreasonable"; (2) "[t]he Task Order identifie[d] two principal purposes, violating the terms of the OASIS ordering procedures" because these procedures "require the contracting agency to identify a *single* integrated professional service as the principal purpose"; and (3) "the market research supporting the procurement strategy [was] inadequate" and "had adequate market research been conducted, it would have been apparent that the IT engineering and safety inspection services could have been competed separately and achieved far greater small business participation." AR 1134–35.

GAO found that there was "no basis to sustain" Plateau's protest. AR 1231. It held that "the broad scope of the OASIS contract reasonably encompasses the requirements described in the task order RFP and expressly permits the procurement of out-of-scope IT services that would support an integrated solution." AR 1230. Moreover, it found that "there is a logical connection between the underlying IDIQ contract and the task order." *Id.*

### E. Procedural History

On July 7, 2022, following its unsuccessful GAO protest, Plateau filed its Complaint in this Court. CTC, the incumbent contractor and an offeror in the task order competition with a "substantial chance of award," intervened in this matter. Mot. to Intervene at 2, ECF No. 12; Order Granting Mot. to Intervene, ECF No. 23. Following completion of the administrative record with documents GSA submitted as part of the various scope reviews, Order Granting Mot. to Complete the Admin. R., ECF No. 28, the parties briefed cross-motions for judgment on the administrative record. The Court held oral argument on the parties' cross-motions on September 27, 2022.

## II. Jurisdiction

The parties do not dispute the Court's jurisdiction over the Complaint. Nevertheless, the Court has the duty "to examine its jurisdiction over every claim before it assumes jurisdiction over the claim." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). The Tucker Act grants this Court jurisdiction to hear bid protests generally. 28 U.S.C. § 1491(b). However, the Court's jurisdiction over bid protests objecting to a task order competition is limited to (1) "protest[s] on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued"; or (2) "protest[s] of an order valued in excess of $10,000,000." 41 U.S.C. § 4106(f)(1). The Court has jurisdiction over this protest because Plateau objects to the

Task Order on the grounds that it is outside the scope of the underlying OASIS IDIQ Contract. Compl. at 1.

### III. Discussion

#### A. Standard of Review

In reviewing cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the United States Court of Federal Claims, courts ask "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). The bid protester "bears the burden of proving error in the procurement process sufficient to justify relief." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed Cir. 1988)).

This Court will set aside an agency's procurement action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *E.g.*, *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (citation omitted). The plaintiff must prove, by a preponderance of the evidence, that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Centech Grp. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)); *People, Tech. & Processes, LLC v. United States*, 151 Fed. Cl. 713, 720 (2021) (quoting *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003)).

"When a challenge is brought on the first ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). Additionally, "[t]he arbitrary and capricious standard applicable in bid protests is highly deferential and requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 500 (2012) (quoting *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (quotation marks omitted)). Thus, the Court examines whether "the contracting agency provided a coherent and reasonable explanation for its exercise of discretion." *Impresa*, 238 F.3d at 1332–33.

In this analysis, "the court 'may not substitute its judgment for that of the agency' if the agency's decision is reasonable." *Omega World Travel, Inc. v. United States*, 82 Fed. Cl. 452, 464 (2008) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)); *see also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). A decision is not reasonable if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency

10

expertise." *Omega World Travel*, 82 Fed. Cl. at 464–65 (quotation marks omitted) (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)).

To succeed on a challenge brought on the second ground, a bid protester must show "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 28 F.3d at 1332–33. Finally, in addition to proving an error in the procurement process under the foregoing standards, the bid protester also bears the burden of showing that it was prejudiced by the error. *BayFirst*, 104 Fed. Cl. at 500 (citing *Bannum*, 404 F.3d at 1356–57). "Prejudice is a question of fact." *Id.*

> **B. The Task Order Solicitation Does Not Exceed the Scope of the OASIS IDIQ Contract, and the OCO's Decision to Utilize OASIS Was Reasonable.**

In a task order scope protest under 41 U.S.C. § 4106(f)(1)(A), the Court assesses "whether the [task] order . . . materially departs from the scope of the underlying contract, such that potential offerors in the original procurement would not have anticipated that the agency would issue [task] orders of that nature under the contract." *E.g.*, *Cal. Indus. Facilities Res., Inc. v. United States*, 104 Fed. Cl. 589, 596 (2012) (citing *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201 (Fed. Cir. 1993)); *BayFirst*, 104 Fed. Cl. at 503–04. The Court engages in a fact-specific inquiry by "comparing the scope of work described in the . . . task order with the scope of work described in the underlying contract." *Solute Consulting v. United States*, 103 Fed. Cl. 783, 793 (2012); *see also Red River Commc'ns, Inc. v. United States*, 109 Fed. Cl. 497, 512 (2013).

A task order whose "predominant . . . scope of work" is ancillary out-of-scope IT services exceeds OASIS's broad scope. AR 23 (OASIS Contract § C.5). But the Court's role under the arbitrary and capricious standard of review is not to determine whether IT services in fact predominate the Task Order. *See* AR 32–33, 76. Rather, the Court is limited to determining whether the OCO reasonably concluded that ancillary out-of-scope IT services are not the "predominant task order scope of work." For the reasons set forth below, the Court holds that the OCO acted reasonably.

In prohibiting task orders with IT as the predominant scope of work, OASIS explains that "'scope of work' does not directly correlate to labor mix/breakdown," and instead "refers to the princip[al] purpose or objective of the work required under the task order." AR 23 (OASIS Contract § C.5). But, while a task order's predominant scope of work is unambiguously defined as the "principal purpose or objective of the work," ("principal purpose") it is not clear how a task order's principal purpose is ascertained under OASIS. *Id.*

The parties advance varying methods for evaluating the Task Order's principal purpose: (1) matching the NAICS code assigned to the Task Order with one of the in-scope OASIS NAICS codes in a purely perfunctory manner ("NAICS matching approach"); (2) engaging in a qualitative assessment of the Solicitation's description of the principal purpose and work deliverables ("qualitative approach"); (3) conducting a quantitative appraisal of the amount of work devoted to ancillary out-of-scope IT versus non-IT in terms of percentage breakdown and number of hours ("quantitative approach"); or (4) a comprehensive approach considering all of

these circumstances. Thus, "principal purpose" could be considered an ambiguous contract term because it is susceptible to more than one reasonable interpretation. *See Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) ("When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity."). However, the Court need not interpret the contract and determine principal purpose's precise meaning under OASIS. Under all reasonable interpretations of the term, the OCO's decision was supported by a rational basis.

### 1. NAICS Matching Approach

The Government prefers the NAICS matching approach, a purely mechanical determination of the Task Order's principal purpose and overall scope. Def.'s Cross-Mot. for J. on the Admin. R. ("Def.'s Cross-Mot.") at 11–12, ECF No. 34. It asks the Court to conclude that the Task Order is within the scope of OASIS because the principal purpose NAICS code assigned to the Task Order is one of the approved, in-scope NAICS codes set forth in the OASIS Ordering Guide Appendix A. *Id.* In support, the Government relies on the language in the OASIS Ordering Guide, which states that "[p]rovided the OCO determines the principal purpose NAICS code for the order to be one of the OASIS NAICS Codes (see Appendix A), it is within scope of OASIS. If the OCO determines it is a NAICS code outside one of the OASIS NAICS codes, it is not within scope of OASIS. It is that simple." AR 76 (OASIS Ordering Guide); *see* Def.'s Cross-Mot at 11. Based on this interpretation of principal purpose, the Court would only confirm whether NAICS 541330, Engineering Services—which the OCO assigned to the Task Order—is listed in OASIS Ordering Guide Appendix A under Pool 1. Under this review, the OCO's decision was patently reasonable.

The NAICS matching approach precludes this Court from reviewing the OCO's initial NAICS code decision. Under this approach, the Court would not have jurisdiction to determine whether the underlying content of the task order PWS fits the principal purpose of engineering services, or whether the requirements should have been solicited in a way that allowed small business participation. Plateau would be required to pursue those claims at the Small Business Administration Office of Hearings and Appeals ("SBA OHA") as a NAICS appeal. *See, e.g.*, 13 C.F.R. § 121.1102 (SBA regulations stating that "[t]he OHA appeal is an administrative remedy that must be exhausted before judicial review of a NAICS code designation may be sought in a court"); *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1255 (Fed. Cir. 2015) (recognizing that a NAICS appeal to SBA OHA is a prerequisite to challenging an agency's designation of a particular NAICS code in this Court); *see also Aerial Timber Applicators, Inc. and Western Pilot Serv., Inc., Appellants*, SBA No. NAICS-5965, 2018 (S.B.A.), 2018 WL 6729023 (Oct. 10, 2018) (analyzing contracting officer's determination of principal purpose in the context of a NAICS appeal).

The Government contends that Plateau's scope protest is an untimely NAICS appeal merely disguised as a task order scope protest. Def.'s Reply at 2–3, ECF No. 37; *see also* 48 C.F.R. § 19.103 (providing that NAICS appeals must be filed with the SBA OHA within ten days from the Solicitation's issuance). However, the Court does not decide that issue here. Plaintiff's protest fails on other grounds because the record demonstrates that the OCO reasonably designated the Task Order's principal purpose, and thereby the NAICS code.

### 2. Qualitative Approach

The qualitative approach examines the tasks and deliverables described in PWS Sections 3 through 5 to determine whether the OCO's description of the principal purpose was reasonable. The Task Order describes its principal purpose as seeking "an integrated, comprehensive SOH program designed to reduce mishap, injury and occupational illness risk, and enable an enduring safety culture across the [DoD]" through "technical, analytic, safety, engineering, and other expertise." AR 876–77. It explains the need for a contractor to "assist maintain [sic] DoD databases in support of the FSOH policy objectives" by "provid[ing] a combination of professional services and ancillary IT services and supplies to support the gathering, analysis, and dissemination of data related to the occupational safety goals of the FSOH." *Id.* at 877.

The Court finds the analytical framework for determining principal purpose in the SBA OHA's decision in *Aerial Timber* instructive. *See* 2018 WL 6729023 at *5. Although that case was a NAICS appeal rather than a task order scope protest, the OHA analyzed whether the task order's purported principal purpose (as defined in that case by the assigned NAICS code) conformed with the work described in the solicitation. *Id.* Following guidelines in the Federal Acquisition Regulation, OHA considered "the industry descriptions in the *NAICS Manual*, the description in the solicitation, the relative value and importance of the components of the procurement making up the end item being procured, and the function of the goods or services being acquired." *Id.* With the exception of reviewing the industry descriptions listed in the *NAICS Manual*, the Court evaluates the reasonableness of the OCO's decision regarding principal purpose guided by these factors.

Generally, the PWS sets forth non-IT work in Sections 3 and 4, while it describes IT work in Section 5. Plaintiff contends that the attempt to segregate IT and non-IT tasks and deliverables in the PWS is "not anchored in the reality of the work required" because the requirements often overlap. Pl.'s Mot. at 18. Specifically, Plateau argues that PWS Sections 3.6 and 3.8 actually describe IT services, and when added to the significant IT services sought in Section 5, IT becomes the principal purpose of the Task Order. *Id.* at 18–20. Furthermore, Plaintiff points to the FSOH director's memorandum stating that the office requires IT staff with "cross functional expertise," meaning that "IT staff will need to be involved in providing the professional services required by the Task Order." Pl.'s Mot. at 18 (citing AR 1165).

Plaintiff relies on the overlap between IT and professional services in the PWS as evidence that IT is the Task Order's principal purpose. However, this overlap illustrates only that the IT work is integral and necessary (i.e., ancillary) to the non-IT work. OASIS expressly permits and encourages this in its definition of "ancillary out-of-scope." AR 23. The difficulty in delineating between non-IT and IT tasks (and the dual roles served by many IT staff) further evinces the Government's point. IT and non-IT tasks are deeply integrated, as OASIS contemplates. IT work does not predominate over requirements that are so integrated. Given OASIS's emphasis on integrated solutions and maximum flexibility, potential offerors in this procurement would have anticipated the integrated work sought in this Task Order.

Moreover, Plaintiff's contention that several requirements in PWS Section 3 meet the OASIS definition of IT is misplaced, at least in part. *See* Pl.'s Mot. at 18–20. OASIS defines IT as "any equipment, or interconnected system(s) or subsystem(s) of equipment that is used for the *automatic* acquisition, storage, analysis, evaluation, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information by the agency." AR 22 (emphasis added). Plateau argues that "PWS Section[s] 3.6 and 3.8 fit squarely within [OASIS's IT] definition" because "each section requires the contractor to support data acquisition, control, and manipulation initiatives." Pl.'s Mot. at 19.

Certainly, some portions of Section 3.6 appear to involve automatic data acquisition, control, and manipulation. *See* AR 895 (Subsection 2 of PWS Section 3.6) (asking the contractor to "[a]ssess Department-wide data available in Advana and coordinate to further integrate with the FR2" to "enabl[e] more robust" data analysis, and update "data element definitions, lists of values, business rules, and mapping"). However, most of Section 3.6 seeks subject matter experts in safety-related data to *manually* assist with developing a data strategy that is compliant with DoD guidance, review safety related data sets, and make "recommendations for updating SOH instructions that incorporate data requirements." AR 894–95. Work centered on data sets is not synonymous with IT services. In fact, OASIS explicitly includes multiple service areas related to data in the category of non-IT engineering services. *See* AR 20 (OASIS Contract § C.2.2.4).

Additionally, there are likely items in PWS Section 5 that meet the definition of non-IT, even though the Section is broadly categorized as IT. For example, Plaintiff identifies FR2 work, "the single largest labor allocation," as primary evidence of IT predominance. Pl.'s Mot. at 28. However, FR2 might be exempt from OASIS's definition of IT as a "National Security System." A National Security System is "a telecommunications or information system operated by the Federal Government, the function, operation, or use of which involves . . . command and control of military forces," or "is critical to the direct fulfillment of military or intelligence missions." *Id.* It does not include systems "used for routine administrative and business applications (including payroll, finance, logistics, and personnel management applications.)" *Id.*

FR2 "provides OSD, Service Agency, and other key DoD users a central location to review, evaluate, and monitor DoD safety data, such as non-hostile fatalities, injuries, suicides, and, in the future, positive drug-test results." AR 639. It "tracks progress towards safety-related goals that support operational readiness; provides a comprehensive leadership view of personnel readiness; focuses on high risk behaviors including drug demand, motorcycle crashes, and suicides; and displays losses and personnel risks for specific organizations, commands, installations, and units." *Id.* Although FR2 has some administrative applications, its function of supporting DoD leadership to ensure operational readiness concerns the command and control of military forces. The record implies that FR2 could even be a mission critical resource in certain applications, which would render FR2 a National Security System—a non-IT service within OASIS's primary scope.

Overall, OASIS was designed for "maximum flexibility" to provide "integrated solutions" across numerous disciplines, including disciplines that are not within its primary scope, provided they meet certain qualifications. *See* AR 23, 77. The PWS scope of work

envisions such an integrated solution to support the FSOH's policy objectives because the professional services and ancillary out-of-scope IT services in this procurement are inextricably linked. At worst, the presence of a significant amount of IT services renders the Task Order's precise principal purpose unclear. But importantly, the Court's function is not to define the principal purpose of the Task Order. Rather, it is to assess whether it was reasonable for the OCO to decide that the principal purpose is *not* ancillary out-of-scope IT services.

The Court will not set the OCO's decision aside where it was reasonable. *Omega World Travel*, 82 Fed. Cl. at 464. The description of the ancillary out-of-scope IT requirements in the PWS makes clear that their relative importance and function are directly tied to supporting the professional services in the form of an integrated solution. Market research and scope reviews suggested that OASIS would be an appropriate contract vehicle given its broad scope and platform for providing integrated solutions. AR 347–413, 420–440, 1196–1200. The OCO and FSOH director also stated that it would defeat the purpose of the procurement to solicit the requirements separately. Decl. of Contracting Officer, Def.'s Ex. A ¶ 3, ECF No. 34-1; AR 1166 (Memo. from Dir. of FSOH to CO, GSA (April 1, 2022)). Therefore, the OCO's decision to procure the combined services under OASIS was reasonable.

### 3. Quantitative Approach

Plaintiff attempts to show that IT predominates quantitatively. It relies on various calculations and comparisons of the amount of IT versus professional services work required under the Task Order. *See* Pl.'s Mot. at 12–13 (calculating costs attributable to IT), 16–17 (calculating labor contributions), 21 (calculating work hours). Specifically, Plateau points to (1) the percentage breakdown of professional services and IT work supplied in past scope reviews and the different iterations of the Solicitation; and (2) the quantity of "labor effort," including the itemization of "number of hours" attributed to IT work in the Internal Government Cost Estimate ("IGCE"). Pl.'s Mot. at 13, 21. The Court does not find these arguments persuasive. The quantitative approach is not a reasonable interpretation of "principal purpose" because OASIS expressly rejects "labor mix/breakdown" as a means of determining a Task Order's predominant scope of work. *See* AR 23 (OASIS Contract § C.5). Plateau's calculations are also independently unpersuasive.

Plaintiff argues that GSA's percentage estimates of professional services work versus IT work submitted for the February 2022 OASIS scope review reveals that GSA believed the ratio of IT to non-IT work was 50/50. Pl.'s Mot. at 12–13. In its OASIS scope review submission, GSA estimated [ * * * ]% professional services work, [ * * * ]% IT work, and [ * * * ]% Other Direct Costs ("ODCs"). AR 1353. Plateau asserts that the [ * * * ]% for ODCs should be added to the IT estimate for a total of [ * * * ]% IT work because "virtually all the ODCs are related to software purchases." Pl.'s Mot. at 13. It suggests that this percentage will increase during the option year because the Solicitation states that an "increase in the [level of effort] as compared to the previous contract in Section 5.4, FR2 Modernization [will begin] in Option Period 01." AR 1037 (Solicitation Amendment 3). Plateau relies on these numbers in arguing that the estimates supplied in the Solicitation and its various amendments, which peg IT at significantly lower percentages, are artificially low. *Id.*

However, even in the calculation most favorable to Plaintiff, IT amounts to [ * * * ]% of the work, increasing beyond [ * * * ]% only in the option year. *See* Pl.'s Mot. at 13. The most recent IGCE estimates [ * * * ] labor hours dedicated to professional services ([ * * * ]%) and [ * * * ] labor hours to IT services ([ * * * ]%). AR 1245–69. Similarly, the most recent version of the Solicitation estimates [ * * * ]% professional services and [ * * * ]% IT. AR 1037. Nothing in the record indicates that GSA's estimates are artificially low. They may even be high, considering that the FR2 system could fall under the definition of a National Security System and therefore count as non-IT. Critically, each of these figures is merely an *estimate*, and the Solicitation requests that offerors propose their own creative solutions to the breakdown of IT and professional services work. AR 1037.

For example, CTC, which has been the incumbent on this work for sixteen years, suggests a more restrictive allocation of IT "full time equivalent" personnel ("FTEs") than GSA's estimates. Intervenor's Mot. for J. on the Admin. R. ("Intervenor's Mot.") at 8, ECF No. 35. It proposes [ * * * ] total FTEs: [ * * * ] to perform professional services work, and [ * * * ] to perform IT work. *Id.* These are the same figures under its current contract performance. *Id.* Moreover, [ * * * ]% of CTC's annual price for its current performance is allocable to non-IT professional service work. *Id.*

Given the figures discussed above, it is not possible to find that the OCO's decision was arbitrary and capricious. It was reasonable for the OCO to issue the Task Order under OASIS based on its principal purpose of professional services. The Task Order does not materially differ from the scope described in OASIS Contract Section C. Potential offerors should not have been surprised by a task order that proposes an integrated solution of professional services and integral, necessary IT services, even in such a significant amount. In fact, market research revealed that many of the potential offerors in this inquiry specifically recommended the OASIS vehicle. AR 373–75; *see also* AR 351–53, 361.

Citing no authority in support, Plaintiff asserts that changes throughout the procurement process indicate arbitrary and capricious decision-making in allocating IT work. Pl.'s Mot. at 12–27. However, the opposite is true. The procurement process's iterative nature is evidence that the OCO considered the level of IT work involved. In fact, the agency submitted the PWS for scope reviews to IT-based GWACs because it was aware of the significant amount of IT work. AR 1196–1200. But GSA learned through those scope reviews that the principal purpose of the work is not IT. *Id.* The agency then solicited market research, which concluded that OASIS was the best contracting vehicle because its broad scope aligned with the similarly broad scope of the PWS. AR 373–75; *see also* AR 351–53, 361. After these inquiries, the agency revised the PWS and labor breakdown estimates with OASIS in mind. *See* AR 449–572 (Original Solicitation and PWS), 786–870 (Solicitation Amendment 1), 873–909 (Solicitation Amendment 1 PWS), 937–1027 (Solicitation Amendment 2), 1029–1113 (Solicitation Amendment 3). The Court will not overturn the OCO's decision merely because one could theoretically reach a better conclusion.

**C.     Plateau is Not Entitled to a Permanent Injunction.**

Plateau seeks a permanent injunction "to prevent GSA from procuring IT services" from OASIS.  Pl.'s Mot. at 27.  When evaluating whether a bid protester is entitled to injunctive relief, the Court considers "whether, as it must, the plaintiff has succeeded on the merits of the case." *PGBA LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004).  Here, Plateau has failed on the merits.  Therefore, its request for a permanent injunction must be denied.

**IV.    Conclusion**

For the reasons set forth above, Plaintiff's Motion for Judgment on the Administrative Record in which it sought declaratory and injunctive relief is **DENIED**.  The Government's and Intervenor's Motions for Judgment on the Administrative Record are **GRANTED**.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge